Mr. Justice FIELD,
dissenting.
I am unable to agree with a majority of the court in this case. I do, not differ from them so much in the judgment rendered as in the reasons assigned for it. Had they placed their decision on the grouud that the plaintiff bank owed the money it was compelled by the decree of the Provost Court to pay, aud, therefore, could not recover it back, however illegal the action of that tribunal, I should have made uo objection to their judgment. But as they pass by this ground aud not only affirm the legality of the establish *299 rnent of the Provost Court by the commanding general at New Orleans, which is not seriously controverted, but the validity of the jurisdiction in civil cases exercised by that tribunal, I must dissent from their opinion. I can find no sufficient warrant for any such doctrine as there,expressed in the action of the government during the late war, or in the previous decisions of this court.
The case, as disclosed by the record, is briefly this: On the 2d of May, 1862, General Butler, commanding the forces of the United States then occupying the city of New Orleans, by general order appointed Major Bell, aid-de-camp of the division staff, provost judge of the city. Soon after this, and previous to the 13th of May, the Union Bank of Louisiana loaned the Mechanics’ and Traders’ Bank of New Orleans $130,000 in Confederate notes. On the 26th of the month the borrowing bank tendered payment of this amount in notes of the same kind, but the tender was refused, the lending bank claiming payment in either the notes of the borrowing bank or in United States currency. It appears that the commanding general had, by proclamation issued on the 16th, prohibited the circulation of Confederate notes after the 27th of the month. This prohibition necessarily affected the value of the notes. A dispute thereupon arose between the two banks as to the character of the currency in which the loan was to be paid, it being contended on the one side that Confederate notes were to be received in payment, and on the other that the money should be refunded in notes as current at the time as the Confederate notes were when they were loaned. The lending bank thereupon brought suit for the $130,000 before the Provost Court.
That court dismissed the suit, holding that the claim was payable in Confederate notes. This was early in July, 1862. Some days afterwards the commanding general directed the provost judge to set this judgment aside, and to try the case again. Accordingly, when counsel for the Mechanics’ and Traders’ Bank appeared in the action after this order and attempted to make a defence, he was informed by the judge that he need not read any law to the court, that the judge *300 had been ordered to grant a new trial, and that “the case would be decided under orders.” A judgment for the amount claimed payable in currency was accordingly rendered in favor of the Union Bank, and the same was paid under protest. This was 011 the 24th of July, 1862.
It was to recover this sum that the present action was brought in a State District Court of Louisiana. That court declined to pass upon the competency of the Provost Court to render the judgment in question, but held that the Mechanics’ and Traders’ Bank was indebted to the Union Bank in the amount for which that judgment was rendered,, and that the same could not be recovered back in the present action; and further, that the 149th article of the constitution of the State of 1868, which declared that all judgments, with certain exceptions, not material in the present case, rendered in good faith and in accordance with existing laws in the State, between the 26th of January, 1861, and the adoption of the constitution, should be valid, secured for the judgment in question, to use the language of the court, “ the validity which probably it did not previously possess.”
On appeal the Supreme Court of the State went further, and held that the commanding general had the right to establish the Provost Court and invest it with jurisdiction to decide all civil cases, including the one complained of; that its establishment was the exercise of the war power of the United States, presumably with the consent and authorization of the President, and that the judgment was validated by the 149th article of the State constitution.
The plaintiff combats these positions, and contends that the commanding general had uo authority to invest that military tribunal with jurisdiction in civil cases; and that it was exempted under the Constitutioirfrom any liability imposed by a judgment rendered in the exercise of any such jurisdiction.
The Constitution secures to every one immunity from liability and consequent deprivation of property from the unwarrantable exercise of jurisdiction by tribunals established under the authority of the United States, whether by Con *301 gress acting under the judiciary article of that instrument, or by the executive, or military officers appointed by him, acting under the war powers of the government. And the right to inquire in this court whether any such unwarranted jurisdiction has been exercised is not, in my judgment, dependent upon the determination of a State court as to the validity of the asserted jurisdiction.*
Had this court, as already stated, confined itself to an affirmation of the judgment of the State court on the ground that the plaintiff' bank owed the money borrowed, and that it could not recover it back in this action, although paid under the coercion of the decree of the Provost Court, I should have acquiesced. But to uphold the civil jurisdiction of that military tribunal upon the presumed assent to its investment with such jurisdiction by the President of the United States, when, as I think, the President refused to permit the exercise of any such jurisdiction during the war, appears to me to be uncalled for and erroneous.
Provost courts are military courts having a well-known jurisdiction, which is limited exclusively to minor offences, tending to disorder and breaches of the peace, by soldiers and citizens within the lines of an army, and occupy with reference to such offences a similar position with that of police courts in our cities.
The power and jurisdiction of these courts were the subject of frequent consideration during the late war by the Judge-Advocate-General of the army, and by him were brought to the attention of the Secretary of War and the President. His opinions upon these subjects, when approved by the Department of War, were adopted as directions of the executive head ofthe government for the guidance of the officers of the army. And it is impossible to read the opinions without perceiving in almost every line that the jurisdiction of the tribunals was limited to offences of a petty character, and that the government intended that such jurisdiction should not in any case be enlarged. By *302 them it was declared that a general commanding a department, in which the ordinary criminal courts wore suspended, was authorized, under circumstances requiring the prompt, administration of justice, to appoint a provost judge for the trial of minor offences, but that the graver violations of the law should be referred to military commissions; that the provost court was a tribunal whose jurisdiction was derived from the customs of war, and was unknown to our legislation ; that it had no jurisdiction of offences of soldiers triable before a court-martial or military commission ; and that the judgment of the Provost Court at New Orleans, directing the imprisonment of men at Ship Island and the Dry Tortugas for desertion, marauding, mutiny, robbery, and larceny, was without sanction of law and wholly void. “ The jurisdiction of a provost court,” said one of these opinions, “should be confined to cases of police merely, to wit: such cases as are summarily disposed of daily by the police courts in our large cities, as, for instance, cases of drunkenness, disorderly conduct, assault and battery, and of violation of such civil ordinances or military regulations as may be in force for the government of the locality. The provost judge supplies the place of the local police magistrate in promptly acting upon the class of cases described, without, at the same time, being necessitated (as a formal military commission would be) to preserve a detailed record of the testimony’ and proceedings in each case.”
In another case, where an order of a commander of a department authorized a provost court to settle questions of title to personal property, it was declared that that was a subject of which no military court could properly take cognizance, and the department commander was advised that the jurisdiction of such tribunals as provost courts, in time of war, could only be extended to matters of police.*
*303 In the face of these promulgations from the department of military justice, approved by the Secretary of War, and through him by the President, how can it be said that the Provost Court in New Orleans was presumably authorized by the President to exercise civil jurisdiction ? From inquiries which I have made since this case has been pending, I think I am justified in stating that no ease has arisen in which the exercise of civil jurisdiction by one of these tribunals has ever been, even impliedly, sanctioned by the government. Whenever any attempt by them to exercise such jurisdiction has been brought to the attention of the executive department, it has been uniformly and promptly condemned.
Besides, the assent of the executive can only be presumed in support of such acts of a subordinate officer as legitimately fall within the sphere of that officer’s duties, and with the execution of which he is usually charged. Acts relating to the movement of troops and the furnishing of supplies to them, directed by the Secretary of War, may well be presumed to have been authorized by the President, because the execution of such measures falls within the sphere of the War Department. But no presumption would arise that they were thus authorized if the directions proceeded from the Postmaster-General or the New York collector of customs, because to neither of those officers are such duties usually intrusted.
Now, it is no part of the duty of a military commander, whether putting down an insurrection against the government or engaged in making foreign conquest, to settle the pecuniary obligations of citizens to each other, or to provide a court for their determination. His whole duty is to subdue, by force, the insurrection in the one case and opposition to the extension of the dominion of his government in the other; and when this is accomplished, to preserve order in the community until his superior authorities direct what further proceedings shall be taken. Until such directions are given the military commander cannot lawfully go beyond his simple military duties.
*304 So, when a civil government was established in New Mexico, by order of General Kearney, after that officer had conquered that province by the forces under his command, he acted pursuant to special instructions from the President, through the head of the War Department. He carried the instructions with him, prepared in advance, so confident was the President that certain conquest would attend the march of our troops.
“ Should you conquer and take possession of New Mexico and Upper California, or considerable places in either,” said these instructions, issued on the 3d of June, 1846, “ you will establish temporary civil governments therein, abolishing all arbitrary restrictions that may exist, so far as it may be done with safety. In performing this duty it would be wise and prudent to continue in their employment all such executive officers as are known to be friendly to the United States, and will take the oath of allegiance to them.”*
I think, therefore, that the majority of the court are mistaken in their statement that there was no express order for the establishment of courts and a judicial system by General Kearney in New Mexico, emanating from the President or commander-in-chief. The authority for the establishment of civil government included the establishment of different departments of such government, judicial as well as others.†
The case of Leitensdorfer v. Webb,‡ cited by the majority in support of their views, does not, therefore, appear to me to touch the real question at issue. There, General Kearney, having his specific instructions from the President, and, as this court stated in that case, “ holding possession for the United States, in virtue of the power of conquest and occupancy, and in obedience to the duty of maintaining the security of the inhabitants, ordained, under the sanction ami *305 authority of the United Stales, a provisional or temporary government for the acquired territory.”
As to. the appointment of Judge Peabody as provisional judge of New Orleans, which was held valid in the case of The Grapeshot* a case cited as conclusive of the question under consideration here, the appointment came directly from the President. On the 20th of October, 1862, he issued his order, reciting that the insurrection had temporarily subr vérted and swept away the civil institutions of. Louisiana, including the judiciary and judicial authorities of the Union, so that it had become necessary to hold the State in military occupation, and that it was indispensable that there should be some judicial tribunal existing there, capable of administering justice; and that, therefore, he had thought proper to establish and did establish a Provisional Court, and appoint a judge thereof, with authority to hear, try, and determine all causes, civil and criminal, including causes in law, equity, revenue, and admiralty, conforming his proceedings, as far as possible, to the course of proceedings and practice of the courts of the United States in Louisiana, but that the appointment of the judge should not extend beyond the period of military occupation of the city of New Orleans or the restoration of the civil authority in that city and State.†
Upon the restoration of the civil authority the Provisional Court thus established ceased to exist. In July, 1866, Congress enacted that all suits, causes, prosecutions, and proceedings of that court, proper for the jurisdiction of the District or Circuit Court of the United States for Louisiana, should be transferred to those courts respectively, and be heard and determined therein, and that all judgments, orders, and decrees of the Provisional Court, in cases thus transferred, should at once become the orders, judgments, and decrees of the District or Circuit Court, as the case *306 might be, and be enforced, pleaded, and proved accordingly.*
We thus have the establishment of the court by the President, and the recognition of the legality of its establishment by Congress. Surely there is no analogy between that case and the one at bar.
No other case is cited in support of the extraordinary judgment of the Provost Court we are now considering, and I feel confident that there is no authority in the previous decisions of this court for the doctrine announced by the majority in their opinion.
I do not question that it was competent for the President to authorize the establishment by militar}' officers, or civilians appointed military governors, of temporary courts, to continue during the war, with civil as well as criminal jurisdiction to the extent essential for the security of persons and property, in territory dominated by our forces, after the overthrow of the insurgent power of the Confederates. Such was the case with the military governor of Louisiana, who was specially authorized in his commission from the President to establish all necessary tribunals within the State, and whose appointment of judges of the third and fourth District Courts in New Orleans was recognized as valid by this court in the cases of Handlin v. Wickliffe, reported in the 12th of Wallace, and Ptmrywit v. Eaton, reported in the 15th of Wallace.† All that I insist upon is, that where *307 such courts were established the authority from the President must be shown, and that it cannot be presumed from the mere existence of the courts, and the exercise of jurisdiction by them. Sometimes, indeed, the general power conferred upon a subordinate officer carried with it authority to establish such tribunals; as, for example, the power conferred upon a military commander to establish a civil government, carried authority to establish tribunals with civil as well as criminal jurisdiction in the territory governed, for the administration of justice. But the mere possession of military power in a particular district within the United States by an officer of the army of the United States carried with it, by itself, no authority to establish tribunals to dispose of civil controversies between the inhabitants of such district, and where any such authority is asserted to have existed it must be shown to have been granted by the President; it cannot be presumed, certainly not where the ordinary jurisdiction of the court excluded any power over civil controversies, as was the ease with provost courts.
But supposing that the provost court in the present case ■was rightly invested with civil jurisdiction, there was nothing to justify its judgment in the case mentioned. It had already given its judgment that the suit before it of the Union Bank should bo dismissed. There its powers ended. What subsequently it did was done under the dictation of its military superior; and so, as if in derision of the proceeding, the provost judge afterwards said to the counsel of the defendant, that no law need be read to him; that the commanding general had ordered a new trial, and that “the case would be decided under orders.”
A judgment thus rendered wants all the elements of a judicial determination, and is entitled to no respect in any tribunal where justice is administered. The commanding general, we all know, was a man of eminent ability, and competent to sit in judgment upon any question of law, however difficult; but he was not judge there; he was only a military chieftain, and his order had nothing in it which *308 took from its character as an arbitrary edict of despotic power.
The position that the judgment of the Provost Court ivas validated by article 149 of the constitution of Louisiana of 1868, does not seem to me to merit any consideration.* The article requires for the validation of the judgment that it must have been rendered in accordance with existing laws in the State, and the assertion that any laws of the State at the time authorized the establishment of a provost court, or that such court should rehear a case upon the mandate of a commanding general of the United States, is a proposition which needs only to be mentioned to be answered.
Besides,' it is a novel doctrine in this country, that a judgment affecting private rights of property, not merely defective for want of compliance with some matter of form, but absolutely void for want of jurisdiction in the court to render it, can be validated by subsequent enactment, legislative or constitutional. I know of no judicial determination recognizing any such doctrine or even looking that way.
Mr. Justice BRADLEY was not present at the argument of this case, and took no part in its decision.

 Trebilcock v. Wilson, 12 Wallace, 692-4.

 See record of opinions in the office of the Judge-Advocate-General, vol. ii, 14; vol. vi, 635, 639; vol. viii, 638; vol. xii, 386; vol. xiii, 392; vol. xv, 519. An excellent digest of these opinions was prepared by Major W. Winthrop, of the United States Army, in 1868, and published by authority of the Secretary of War.

 Executive Documents, 2d session of 29th Congress, vol. iii, 1846 and 47, No. 19.

 The ordinance of General Kearney establishing civil government in New Mexico, with courts of civil and criminal jurisdiction, provided that the judges of those courts should be appointed by the President of the United States. Same documents, No. 19, page 80.

 20 Howard, 176.

 9 Wallace, 129.

 See the commission of President Lincoln to Mr. C. A. Peabody, supra, p. 279.,

 15 St:it. nt Large, 360.

 The following is a copy of tlie commission issued by the President to ■General Shepley as military governor of Louisiana :
“Commission as Military Governor.
“War Department, Washington City, .Tunc 31,1862.
■“ Hon. George F. Shepley, &c , &e.
“Sir : You are hereby appointed military governor of the State of Louisiana, with authority to exercise and perform, within the limits of that State,.all and singular the powers, duties, and functions pertaining to the office of military governor (including the power to establish all necessary offices and'tribunals and suspend the writ of habeas corpus), during the pleasure of the President, or until the loyal inhabitants of that State shall organize a civil government in conformity with the Constitution of the United States.
“ By the President.
[Seal.op the .United States.] “ JS. M. Stanton,
“ Secretary of War.”

 See the 149th article in the statement of the case, supra, 281.